**NATIONSBANK OF NORTH CAROLINA, N.A., as Trustee for the NationsBank and Designated Subsidiaries Retirement Plan and Trust, Plaintiff,**

v.

**CAPITAL ASSOCIATES INTERNATIONAL, INC.,**

No. C–C–91–27–MU.

United States District Court, W.D. North Carolina, Charlotte Division.

Feb. 15, 1996.

Kiran' H. Mehta, Kennedy, Covington, Lobdell & Hickman, Charlotte, NC, for NCNB National Bank of N.C., as Trustee for the NCNB Corporation and Designated Subsidiaries Retirement Plan and Trust.

Felicia A. Washington, Kiran H. Mehta, Kennedy, Covington, Lobdell & Hickman, Charlotte, NC, for Nationsbank of North Carolina, N.A., as Trustee for the Nations-Bank and Designated Subsidiaries Retirement Plan and Trust.

Charles F. Carpenter, Newsom, Graham, Hedrick, Bryson & Kennon, Durham, NC, for defendant.

## OPINION

MULLEN, District Judge.

**THIS MATTER** comes before the court following a non-jury trial on October 4, 1994. This case is a declaratory judgment action filed by the plaintiff, NationsBank of North Carolina, N.A., as Trustee for the NationsBank and Designated Subsidiaries Retirement Plan and Trust ("NationsBank") against the defendant, Capital Associates International, Inc. ("Capital Associates") seeking a determination as to the ownership and title to certain property located in Mecklenburg County, North Carolina. More specifically, the action seeks a determination of ownership and title with regard to a specified list of property hereinafter referred to as the "disputed items." The issue of damages is also before the court.

### FINDINGS OF FACTS AND CONCLUSIONS OF LAW

The defendant, Capital Associates, is a Colorado Corporation whose business includes the leasing of office furniture, equipment, and computers to other business enterprises throughout the United States. On or about March 31, 1988, Capital Associates entered into a Master Lease Agreement with Pandick, Inc. ("Pandick"), a corporation involved in the electronic dissemination of business and legal information. Under the terms of the Master Lease Agreement, Capital Associates would agree to purchase and then lease back to Pandick, all office furniture, furnishings, equipment, and computers as may be required by Pandick for its operation in any of its locations.

Sometime around July 1988, representatives from Pandick began investigating the possibility of locating an office at the Huntersville Business Park located in Huntersville, North Carolina. In July of 1988, there were several buildings either recently con-

structed, or under construction, which were owned by NationsBank, and were constructed for the purpose of housing business offices or manufacturing facilities. The representatives from Pandick met with Mr. Ralph Oldham of Spectrum Properties, Inc., a real estate brokerage firm acting as rental agent for NationsBank.

After some negotiations, a lease agreement was entered into in late July, 1988 by Pandick and NationsBank for the lease of building space in the Huntersville Business Park. As part of the lease agreement, NationsBank promised to provide an up-fit allowance to Pandick of $25 per square foot. For the space rented, the total up-fit allowance was $862,250.

Pandick contracted with Edison–Foard as general contractor for performing the up-fit of the building. Because of the complex electrical need for Pandick's computer operation, Reid Electric Company was separately hired as electrical contractor to perform the electrical work. Edison–Foard employed various subcontractors to assist in the completion of the up-fits for Pandick's office space.

NationsBank expended the entire up-fit allowance in paying for improvements made by, for, or at the request of Pandick, and in accordance with plans and specification prepared by or at the direction of Pandick. NationsBank conditioned the payment of the up-fit allowance upon Pandick presenting to it draw requests describing newly constructed or installed improvements, after which NationsBank would obtain confirmation from its construction staff and an architect that the improvements indicated on the draw request had been obtained and properly installed. The up-fit allowance was disbursed through a series of direct payments to Pandick.

NationsBank did not know that Pandick and Capital Associates had entered into a lease for equipment; however, Capital Associates did know that its equipment was being installed in a building in the Huntersville Business Park where Pandick was a tenant. Capital Associates did not itself notify NationsBank of its claimed interest in the disputed items and also did not require Pandick to obtain from its landlord, NationsBank, a waiver or estoppel certificate with respect to rights to the equipment being installed in the Huntersville Business Park, even though paragraph 3.12 of the lease between Capital Associates and Pandick provides:

> If required by Lessor [Capital Associates] or its Assignee, Lessee [Pandick] shall obtain as to the site where any item of Equipment is located, a waiver from the landlord [NationsBank] and mortgagee thereof with respect to any of their rights under local law to levy or distrain upon the Equipment. Lessee agrees to promptly and duly execute and file all documents necessary to protect and place on public record Lessor's rights hereunder.

Neither did Pandick file any documents to protect and place on public record any rights of Capital Associates to the disputed items.

On or about September 17, 1990, Pandick filed a petition under Chapter 11 of the Bankruptcy Code seeking protection from its creditors, including NationsBank as its landlord and Capital Associates as lessor of equipment under the Master Lease Agreement. Subsequently, Pandick's Chapter 11 petition was converted to a Chapter 7 bankruptcy. At some point in the bankruptcy proceedings, Pandick abandoned the property located in the leased premises in Huntersville to its creditors. Pandick no longer remains in business.

NationsBank allowed Capital Associates to remove all of its equipment and furnishings from the leased premises except the following disputed items which NationsBank claimed are fixtures and therefore must remain with the property:

(1) Computer raised/access flooring (approximately 24,000 square feet).

(2) Uninterruptable Power System ("UPS"), including the following components:

   (a) Liebert 400 KVA with ten minute sealed battery system, battery disconnect switch, remote status panel, and five percent (5%) harmonic distortion filter;

   (b) UPS wiring;

   (c) Automatic transfer switch; and

   (d) UPS bypass switch.

(3) Heating, ventilating and air-conditioning ("HVAC") systems in two components:

(a) Rooftop HVAC units; and

(b) Five specialized Liebert "room air conditioners" installed in the computer rooms. All such units are connected with hard wire cables and piping (through walls and concrete flooring) to compressors located outside the Premises.

(4) Six Liebert Precision Power Centers served as electrical power distribution equipment for the Premises.

(5) Liebert Sitemaster 200, which monitored the Liebert room air conditioners and controlled the temperature in each of the computer rooms.

When NationsBank refused to release the disputed items, this lawsuit was filed. Subsequent to the filing of this lawsuit, items 2, 3(b), 4, and 5 of the above list of disputed items were removed and stored by NationsBank. Items 1 and 3(a), remain in place and in use by the current tenant of the facility, Electronic Data Systems Corporation ("EDS").

This court finds itself in the atypical situation where an experienced banking institution and an experienced asset-based financing company failed to protect themselves by appropriate public records, and this court now must determine ownership of the disputed items under North Carolina Fixture and trade fixture law. If either party had protected itself, a lawsuit such as this one would not have been necessary.

In deciding the rightful owner of the disputed items, this court must first determine whether the Master Lease Agreement between Pandick and Capital Associates was a "true lease" or a conditional sales contract in which the equipment was actually sold to Pandick.

The North Carolina courts have articulated several factors which they examine when deciding whether a lease is a true lease or a conditional sales contract. One of the leading cases in this area is *Borg–Warner Acceptance Corp. v. David*, in which the court found that the lease was a true lease. *Borg–Warner Acceptance Corp. v. David*, 32 N.C.App. 559, 232 S.E.2d 867 (1977), *cert.*

denied, 292 N.C. 640, 235 S.E.2d 61 (1977). In *Borg–Warner*, the issue was squarely before the court as to whether or not a lease was a "true lease," or was in fact a "conditional sales contract." In finding that the lease at issue was in fact a "true lease," the court noted the following factors:

The instrument on its face is designated a lease in which plaintiff is named as lessor and Key, Inc., is named as lessee. It is for a fixed term of 60 months and specifies the amount of the monthly rental payments to be made by the lessee to the lessor. In addition, the instrument contains the following provisions: no title or right in the equipment passes to lessee except the rights expressly granted; the equipment "shall always remain and be deemed personal property even though attached to realty"; the lessee agrees to keep the leased property "in first class condition and repair" at lessee's expense, and all "repairs for accessories made to or placed in or upon said equipment shall become a component part thereof and title thereto shall be immediately vested in lessor and shall be included under the terms" of the lease; on expiration of the rental period or other termination of the lease the leased equipment is to be shipped to lessor at lessee's expense. More importantly, nowhere in the instrument is the lessee given any right to renew the lease, to extend its term, or to purchase the leased property. Such an arrangement is a valid lease and not a security agreement. *In re: Wright Homes, Inc.*, 279 F.Supp. 598 (M.D.N.C. 1968); *see, Leasing Corp. v. Hall*, 264 N.C. 110, 141 S.E.2d 30 (1965).

*Id.* at 561–562, 232 S.E.2d 867.

■ Applying the same factors and analysis to the Master Lease Agreement before the court, this court finds that the Master Lease is a "true lease." The Master Lease is denoted as a lease on its face; it sets forth that the lease "is an agreement of lease only"; it denotes the parties to it as "lessor" and "lessee"; it is for a fixed term of 36 months and establishes a formula for computing the monthly rental payments; it reserves full legal title in the property to Capital Associates and gives no title or right in

the equipment to Pandick except for right of possession while not in default; it prohibits Pandick from transferring possession, assigning, or pledging the equipment; it prohibits Pandick from allowing liens to be placed on the equipment; it contains specific language about the property remaining personalty even if attached to realty; it contains provisions that require Pandick to keep the property in good condition, and to repair it at its own expense; and most importantly, although there is an automatic renewal for an additional 24 month period unless Pandick opts out, there is no right to Pandick to purchase or own the equipment upon the termination of the lease. Further, shipment of the equipment to Capital Associates upon the termination of the lease was to be undertaken at Pandick's own expense. Thus, under the tests in *Borg–Warner*, the Master Lease Agreement is a "true lease."

■ The plaintiff argues that the motivation of Pandick in leasing, rather than financing the purchase of numerous items of equipment, including the "disputed items," should be a factor to be considered by the court. It is undisputed that Pandick could not have financed the equipment because of recent agreements in a leveraged buy-out. The plaintiff argues that this restriction led Pandick to set up the Master Lease Agreement as a way to purchase the equipment and that therefore, looking at motive, the lease is actually a conditional sales contract.

The issue of a party's motive as a consideration in this context was posed to Judge Gordon in *In re: Wright Homes*, where he concluded:

> It is clear that the agreement here in controversy is, at least in part, an attempt to circumvent the North Carolina registration requirements for conditional sales, but the existence of questionable motives cannot detract from the validity of the agreement as a lease. There was no fraud or misrepresentation and the language of the instrument is clear and unambiguous. Ownership is expressly to remain in the lessor and this Court cannot place it with the lessee.

*In re: Wright Homes* at 602–603. Thus, while Pandick may have indeed entered into the lease to get around the restrictions of the LBO documents against incurring additional financing, this does not change the fact that the Master Lease Agreement is a "true lease."

Having concluded that the Master Lease Agreement is a "true lease," the court must now decide if the disputed items are real estate fixtures and thus must remain with the property or trade fixtures which may be removed.

■ A fixture is defined as property "which, though originally a movable chattel, is, by reason of its annexation to land, or association in the use of land, regarded as part of the land, partaking of its character." *Little v. Nat'l Serv. Indus., Inc.*, 79 N.C.App. 688, 692, 340 S.E.2d 510, 513 (1986). North Carolina courts have developed the following factors to determine whether an article of property is sufficiently connected to land so as to render it a fixture:

> (1) the manner in which the article is attached to realty ...; (2) the nature of the article and the purpose for which it is attached to the realty ...; and (3) the intention with which the annexation of the article to realty is made.

*Id.* The "controlling test" is the intention with which the parties attached the articles to the real estate. *Ingold v. Phoenix Assurance Co.*, 230 N.C. 142, 52 S.E.2d 366 (1949); *Lee–Moore Oil Co. v. Cleary*, 295 N.C. 417, 419, 245 S.E.2d 720, 722 (1978) ("whether a thing attached to the land be a fixture or chattel personal, depends upon the agreement of the parties, expressed or implied").

The lease between Pandick and Nations-Bank provides that "NCNB [NationsBank] will build out 100% of [Pandick's] space at [NationsBank] expense and that: ·

> All alterations, additions or improvements, including without limitation, all walls, railings, carpeting, floor and wall coverings and other permanent real estate fixtures (excluding, however Lessee's trade fixtures ...) made by, for, or at the direction of Lessee [Pandick], shall when made, become the property of Lessor [Nations-Bank] and shall remain upon the Premises

at the expiration or earlier termination of this Lease.

NationsBank Lease, para. 4. Thus, the parties contemplated that NationsBank would provide the up-fit allowance for the improvements to the premises, and in return, NationsBank would receive the title to all non-trade fixture improvements.

■ The general rule is that "trade fixtures are those items of personal property brought upon the land by a tenant which are necessary to carry on the trade or business to which the land will be devoted." 35 Am. Jur.2d, Fixtures, § 3, p. 701. A North Carolina court has also said that "the tenant is allowed to remove what has apparently become affixed to the land, if affixed for the purpose of trade and not merely for the better enjoyment of the premises." *Springs v. Atlantic Refining Company*, 205 N.C. 444, 171 S.E. 635 (1933).

The question still before this court is whether the disputed items are real estate fixtures which must remain with NationsBank or trade fixtures which belong to Capital Associates. This court finds that the access flooring and rooftop air-conditioners are fixtures which must remain with the property. The remaining disputed items are trade fixtures which rightfully belong to Capital Associates.

■ The computer access flooring attached to the premises has become part of the premises, indeed it is the actual floor in most of the premises. If the flooring were removed the entire proportion of the space would be thrown off, for instance the doors would be hanging too high. Furthermore, the parties' intention in the NationsBank Lease was that the floor covering the concrete slab would belong to NationsBank ("floor and wall coverings ... made by, for, or at the direction of Lessee, shall when made become the property of Lessor"). There is nothing unique about Pandick's business which would render the floor a trade fixture. Raised access flooring is utilized in many office spaces, because it maximizes flexibility in the arrangement of computers, which almost any business today uses.

The rooftop air-conditioners are also part of the building itself in that they provide the air-conditioning and heating for the building. Any tenant would require such a system for any business. The rooftop air-conditioners are attached to the building both by being affixed to structural supports built into the roof and by the fact that the finished roof is built around the installed air-conditioner. In order to remove the air-conditioners, it would be necessary to tear up part of the roof itself.

■ Unlike the flooring and the rooftop air-conditioners, the remaining disputed items are not so related to the premises that they are part of the premises. The remaining disputed items, the UPS, five Liebert room air conditioners, six Liebert Power Centers, and Liebert Sitemaster 200, are related to the business or "trade" that Pandick conducted on the premises and are therefore trade fixtures. All of the remaining disputed items are necessary to conduct a business of data processing; they are not necessary for the premises to be utilized for another business. They were brought onto the premises for the purpose of the trade and not for the general betterment of the premises. In fact, the contract clearly contemplates that the room air conditioners are trade fixtures, because it requires them to be capped off if removed.

### Damages

■ NationsBank argues in its post-trial brief that even if any of the disputed items are found to belong to Capital Associates, it should retain possession of the items and pay Capital Associates the 1991 fair market value of the items. This court disagrees with NationsBank analysis. The disputed items which have been found by this court to belong to Capital Associates are to be returned to the possession of Capital Associates. These items are: the UPS, the five room air-conditioners, the six Liebert Precision Power Centers, and the Liebert Sitemaster 200.

Furthermore, NationsBank must pay Capital Associates for the diminution of value of these items from 1991 to 1994. Luckily, the parties' post-trial briefs agreed in their assessment of the diminution in value of the items which this court has found to belong to

Capital Associates. The diminution in value from 1991 to 1994 is as follows:

| | |
|---|---|
| UPS | $5,000.00 |
| UPS Battery Back-up | 5,000.00 |
| Liebert A/C and PDU's (all units combined) | 0.00 |
| **Total** | **$10,000.00** |

Therefore, NationsBank must pay Capital Associates $10,000 in damages plus post-judgment interest in addition to returning the items that this court has found that it unlawfully converted.